**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Fort Lauderdale Division**

**CASE NO. 0:19-cv-62843-AHS**

BRAD TUCKMAN,

      Plaintiff,

v.

WELLS FARGO BANK, N.A., JPMORGAN
CHASE BANK, N.A., and JOHN TORRES,

      Defendants.

_____/

**DEFENDANT JPMORGAN CHASE BANK, N.A.'S MOTION TO COMPEL**
**ARBITRATION, TO DISMISS OR STAY PENDING ARBITRATION, AND**
**SUPPORTING MEMORANDUM OF LAW**

| | | |
|---|---|---|
| I. | INTRODUCTION ......................................................................................... | 1 |
| II. | BACKGROUND ............................................................................................ | 3 |
| III. | MEMORANDUM OF LAW ........................................................................... | 7 |
| A. | The FAA governs Tuckman's purported claims and mandates arbitration. ................... | 7 |
| B. | The arbitration provision delegates arbitrability determinations to the arbitrator and, therefore, this Court need not conduct any further analysis. ............................... | 10 |
| C. | Tuckman's claims are arbitrable in any case. .......................................................... | 12 |
| 1. | Tuckman's claims fall within the scope of the arbitration provision........................ | 12 |
| 2. | Chase can enforce the arbitration provisions against Tuckman................................. | 14 |
| a. | Tuckman is equitably estopped from denying Chase's right to enforce the arbitration agreement against him. ........................................................................ | 15 |
| b. | Tuckman is bound by the arbitration provision as BFF is his alter ego. ................. | 17 |
| c. | Tuckman is judicially estopped from denying his obligation to arbitrate................ | 18 |
| d. | The Complaint's allegations confer third-party beneficiary status on Chase, and therefore Chase can enforce the arbitration provision in the Funding Agreement. ................................................................................................................. | 18 |
| D. | Alternatively, judicial estoppel bars Tuckman's case entirely. .................................... | 19 |
| IV. | CONCLUSION............................................................................................... | 20 |

Pursuant to 9 U.S.C. §§ 3 and 4 of the Federal Arbitration Act ("FAA"), Defendant JPMorgan Chase Bank, N.A. ("Chase") moves to compel arbitration of Plaintiff Brad Tuckman's ("Tuckman") claims and to dismiss or stay this action pending arbitration.[1]

## I.    INTRODUCTION

This case arises out of a Depositor Funding Agreement ("Funding Agreement") that Tuckman's company, Bird Film Fund, LLC ("BFF"), entered into with Forrest Capital Partners, Inc. ("Forrest Capital") (controlled by Benjamin McConley), and Weathervane Productions, Inc. ("Weathervane") (controlled by Jason Van Eman). In an apparent attempt to obscure the real parties in interest, Tuckman omits the names of these corporate entities in his Complaint and instead refers to them as "Tuckman's business" and "McConley's and Van Eman's businesses." Cmplt. ¶ 109 [ECF No. 1]. The intent, presumably, is to try to side-step the fact that the Funding Agreement not only applies here but contains a binding arbitration provision. That arbitration provision is enforceable in this case, Tuckman's efforts to avoid it notwithstanding. Through the instant Complaint, Tuckman seeks to recover money he admits his business, BFF, lost under the Funding Agreement. He cannot ignore the corporate form of the actual party in interest to circumvent the binding arbitration provision applicable to this dispute.

Also, while Chase had nothing to do with the Funding Agreement (it did not sign, draft, negotiate, participate in, or know of it until Tuckman provided a copy during settlement discussions preceding this lawsuit), the arbitration provision expressly requires that BFF arbitrate

---

[1] By filing this motion to compel arbitration, Chase does not waive, and expressly reserves its right, to move to dismiss the complaint under Fed. R. Civ. P 12 if Chase's arbitration motion is denied. *See, e.g., Baptist Hosp. of Miami, Inc. v. Medica Healthcare Plans, Inc*., 376 F. Supp. 3d 1298, 1312 (S.D. Fla. 2019) ("[I]f this Court denies Medica's motion to compel arbitration, Medica should be permitted to file a motion to dismiss on the merits pursuant to Rule 12.").

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

*any* dispute emanating from the Funding Agreement—including this one. Both the Eleventh Circuit and Florida courts hold that a non-signatory to an arbitration agreement may enforce it under a number of circumstances, which are present here. Among other things, estoppel principles allow Chase to enforce the arbitration provision. Tuckman sues Chase and former Chase branch banker John Torres ("Torres"), along with Wells Fargo Bank, in place of the actual wrongdoers— Forrest Capital, Weathervane, and their principals—who, according to the Complaint, stole BFF's money. Tuckman claims Chase aided and abetted Forrest Capital and Weathervane in carrying out the fake investment deal set forth in the Funding Agreement. The Funding Agreement is clearly at the root of all Tuckman's alleged claims against Chase. The claims are therefore arbitrable under the Funding Agreement and the FAA. Further, the Funding Agreement makes Chase an intended third-party beneficiary, enabling Chase to enforce the arbitration provision as a matter of controlling FAA law. Similarly situated plaintiffs have already tried to avoid a nearly identical arbitration provision in a similar Funding Agreement by suing Chase in court for purportedly aiding and abetting Forrest Capital's alleged investment scam. Chase successfully compelled those plaintiffs to arbitration. *See, e.g.*, May 14, 2019 Order Granting Motion to Compel Arbitration, *Stuart Benjamin, et al. v. JPMorgan Chase Bank, N.A., et al.*; Case No. 18STCV0783 (Cal. Superior Ct., Los Angeles County), Ex. A hereto.

**Moreover, under the FAA and the terms of the arbitration provision at issue here, any question about the arbitrability of Tuckman's claims or the scope of the arbitration provision are to be resolved by the arbitrator.** The Funding Agreement expressly requires arbitration of any disputes concerning "the enforcement, interpretation or . . . applicability" of the arbitration provision. Also, the Funding Agreement specifies that any arbitration is to be conducted

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

pursuant to JAMS arbitral rules, which expressly grant the arbitrator the power to decide matters of arbitrability. Based on this delegation clause, it is for an arbitrator to determine, in the first instance, if the arbitration provision at issue applies to Tuckman's claims.

Accordingly, the Court should dismiss or, under § 3 of the FAA, stay this action in favor of an arbitral decision determining whether Tuckman's alleged claims fall within the scope of the arbitration clause and whether any of those claims have any merit.

## II.    BACKGROUND

Tuckman entered the Funding Agreement as the Managing Member of BFF, together with Forrest Capital and Weathervane, to fund a motion picture project called "Dr. Bird's Advice for Sad Poets." *See* Funding Agreement, at 1, Ex. B hereto. Pursuant to the Funding Agreement, BFF and Forrest Capital were each required to contribute $1,850,000 to a specific bank account at Chase defined as the Project Master Account. *Id*. ¶¶ 8, 10. The Funding Agreement also required Weathervane to obtain a $3,700,000 "line of credit" from Chase in order to repay BFF's contribution and fund the motion picture production. BFF would receive any profits from the production, and Forrest Capital and Weathervane were to receive a funding fee. *Id*. ¶¶ 4, 5.

The Funding Agreement's arbitration provision states:

> ***Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by binding arbitration in Miami, Florida before one arbitrator selected pursuant to the JAMS rules and procedures. The arbitration shall be administered by JAMS pursuant to its JAMS' Comprehensive Arbitration Rules and Procedures.*** The Parties agree to confidential arbitration and any disclosure of said arbitration or the parameters of the terms of the dispute, claims or controversy constitutes an automatically forfeiture [sic] of the breaching parties claim. The Parties hereby agree to waive the right to seek punitive damages or equitable and the arbitrator shall not have the authority to award such damages or relief. Judgment on the arbitration award may be entered in any court having jurisdiction. The prevailing party in any arbitration shall be entitled to recover its

3

reasonable attorney's fees and costs incurred in connection with the arbitration against each non-prevailing party. Only in cases of injunctive relief shall a party seek relief from a court outside of arbitration.

*See id.* ¶ 14 (emphasis added). The agreement further bound the "signatories," including Tuckman, to "specifically agree to the terms set forth in this Section 8," which restricted the use of the Master Account to obtaining the "line of credit" and expressly barred removal of BFF's $1.85 million deposit. *See id*. at 3.

In *Bird Film Fund, LLC, et al. v. Weathervane Productions, Inc., et al*., BFF previously sued Forrest Capital and Weathervane for failure to perform under the Funding Agreement. *See* Case No. CACE18017299 (17th Jud. Cir. Broward County, FL), Ex. C hereto.[2] BFF's Broward Circuit Court action, filed July 19, 2018, sought to enforce a settlement and forbearance agreement BFF had allegedly entered into with McConley, Forrest Capital, and Weathervane just the prior month as a result of the latter parties' alleged defaults under the Funding Agreement. *See id*. On November 21, 2018, BFF secured a Consent Judgment against Forrest Capital and McConley. Ex. E hereto. That Consent Judgment was later amended on January 2, 2019 to give BFF a judgment in the amount of $3,774,693.65. Ex. F hereto. BFF then, on July 10, 2019, obtained a Consent Judgment against Weathervane in the amount of $2,571,105.34, jointly and severally with BFF's Forrest judgment.[3] Ex. G hereto. Thus, Tuckman (through BFF) already has combined judgments worth about $3.8 million against the parties who allegedly stole BFF's money.

---

[2] Kreate Films, LLC, an administratively dissolved entity run by Tuckman's wife, is also a party to the settlement and forbearance agreement and a plaintiff in the Broward Circuit Court Lawsuit.

[3] Notably and unusually, Tuckman and BFF were represented by the same counsel (Paul Silverberg, Esq. and Silverberg and Weiss, P.A.) as Weathervane, Forrest Capital, and its principals in not only the Funding Agreement but also in the settlement agreement that precipitated the Broward Circuit Court Lawsuit. Moreover, Tuckman admits he performed "due diligence" on Weathervane and Forrest Capital prior to entering the Funding Agreement—so he was

4

Tuckman filed this action on November 15, 2019 in his own name, never mentioning BFF, Forrest Capital, or Weathervane by name. *See generally* Cmplt. He alleges the funding he was promised pursuant to the Funding Agreement never materialized and the investment was all a fraud. *Id.* ¶ 122. Though he makes repeated references to the Funding Agreement in the Complaint, and though the Funding Agreement forms the premise of his claims, he notably does not attach it. The Complaint alleges that a former Chase branch employee, Torres, sent a letter dated October 31, 2017 indicating that Forrest Capital was a customer in "good standing." This purported letter (the authenticity of which is quite questionable) made it abundantly clear that BFF was the real party in interest under the Funding Agreement. Though addressed to Mr. Tuckman individually, the letter refers to BFF as one of the "authorized signatories," and describes how an account would be "opened and managed in accordance with the Funding Agreement dated as of October 30, 2017 among said parties" and, in particular, that the "new account [was] to be opened in the name of project master account for *Bird Film Fund, LLC*." Oct. 31, 2017 ltr, Ex. D hereto (emphasis added). Further, the putative letter explains, the master account would be used to "return to Bird Film Fund LLC. the matched funds (One Million Eight Hundred Fifty Thousand, $1,850,000) Bird Film Fund, LLC will deposit via wire to Chase." *Id.* This allegedly caused Tuckman, acting as BFF's Managing Member, to send his notarized signature on the Funding Agreement and then wire the $1,850,000 to the Chase account. Cmplt. ¶ 115.

---

undoubtedly aware of the well-documented and checkered history of Weathervane, Forrest Capital and its principals. Cmplt. ¶¶ 102, 105. Further, Tuckman (a savvy businessman) never requested a loan agreement or commitment letter from Chase regarding the supposed credit line sought by Forrest Capital or Weathervane. Nor did he request Chase to place BFF's money into a traditional, protected escrow account. Tuckman attempts to somehow make Chase liable for BFF's risky and foolish investment decision.

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

The Funding Agreement is no less explicit that BFF is the real party in interest rather than Tuckman individually. BFF is defined as the "DEPOSITOR" and is specifically listed as one of the parties. Funding Agreement at 1. The Funding Agreement then refers to the return of "the Deposit Amount to DEPOSITOR," describes the obligations of BFF as DEPOSITOR to "deposit the sum of US $1,850,000.0 [sic] … in the Project Master Account through the Chase hold account," and is replete throughout with references to BFF as the real party in interest as "DEPOSITOR" under the Agreement, *e.g.*:

> The Weathervane Line of Credit is to be used solely for the benefit of DEPOSITOR … until DEPOSITOR deposits the Deposit Amount in the Project Master Account.

> Return of the Deposit Amount to Depositor (if applicable): The DEPOSITOR funds in the Project Master Account shall be returned to the DEPOSITOR within two (2) business days of the first of [certain event]…

> The first tranche in an amount equal to U.S. ONE MILLION EIGHT HUNDRED AND FIFTY THOUSAND DOLLARS ($1,850,000) for the sole benefit of DEPOSITOR shall be paid to DEPOSITOR….

*Id*. at 2.

The Complaint, though purportedly brought in Tuckman's individual name, includes no alleged facts that might call into doubt BFF's role as the real party in interest in the action. The Complaint alleges Forrest Capital's principal, McConley, and Weathervane's principal, Van Eman, stole BFF's $1,850,000 contribution from the Chase account. The money allegedly was deposited and never returned or applied to any loan from Chase, and was never matched by Forrest Capital's or Weathervane's principals. *Id*. ¶¶ 122-23. The Complaint alleges the Funding Agreement was "false and fraudulent," *id*. ¶ 122, but alleges no facts to identify Tuckman as the alleged defrauded party. Yet, based on these allegations, Tuckman purports to assert six counts in his own name against Chase: civil RICO under 18 U.S.C. § 1962(c); civil RICO conspiracy under

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

18 U.S.C. § 1962(d); fraud; conspiracy to defraud, aiding and abetting conversion; and aiding and abetting fraud. Cmplt. at 19-23.

### III.   MEMORANDUM OF LAW

The law is clear that where, as here, the arbitration provision contains a clause not only delegating the determination of arbitrability to the arbitrator but also specifying arbitration rules, which themselves require delegation of arbitrability questions to the arbitrator, the Court must defer the arbitrability decision to the arbitrator. *See* 9 U.S.C. § 2; *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019); *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 69-70 (2010). This includes determining the proper parties to the arbitration and the claims within the arbitration agreement's scope. Since the arbitration provision in this case expressly delegates questions of arbitrability to the arbitrator and incorporates arbitration rules providing for such delegation, this Court need not go further and should compel Tuckman's claims to arbitration.

Nonetheless, were this Court to decide arbitrability, it must conclude that Chase can enforce the arbitration provision, that Tuckman is subject to it, and that Tuckman's purported claims fall within the scope of the arbitration provision. After successfully prosecuting claims in BFF's name arising out of the very same Funding Agreement at issue here, Tuckman is judicially estopped from denying the application of that agreement and, concomitantly, its arbitration provision to him individually.

### A.  The FAA governs Tuckman's purported claims and mandates arbitration.

The FAA "reflects an emphatic federal policy in favor of arbitral dispute resolution." *KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) (citations, internal quotes omitted); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985); *Southland Corp. v. Keating,* 465 U.S. 1, 10 (1984). The operative provision, § 2, provides that a written arbitration contract "evidencing a

7

transaction involving commerce … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA thus "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter*, 470 U.S. at 218 (citing 9 U.S.C. §§ 3, 4). Moreover, "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). The "liberal federal policy favoring arbitration agreements" is intended "to relieve congestion in the courts and to provide parties with an alternative method for dispute resolution that is speedier and less costly than litigation." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367 (11th Cir. 2005) (quotations omitted). It is also intended, in its strong presumptions favoring arbitration, to overcome "the old common law hostility toward arbitration." *Southland*, 465 U.S. at 14.

The Supreme Court has recognized "only two limitations on the enforceability of arbitration provisions governed by the Federal Arbitration Act: they must be part of a written contract 'evidencing a transaction involving commerce' and such clauses may be revoked upon 'grounds as exist at law or in equity for the revocation of any contract.'" *Southland*, 465 U.S. at 10-11 (quoting 9 U.S.C. § 2). The goal "is to give arbitration agreements the same force and effect as other contracts." *Caley*, 428 F.3d at 1367. While § 2's savings clause preserves generally applicable state contract defenses, state laws "that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue," and "state-law rules that stand as

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

an obstacle to the accomplishment of the FAA's objectives," are preempted. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 343 (2011).

The arbitration provision here satisfies the FAA's requirements. It is in writing and "involve[d] commerce"—the deposit of millions of dollars in a Chase bank account to fund a motion picture by parties from Nevada (Weathervane, which actually signed the agreement in Oklahoma) and Florida (BFF). *See Citizens Bank v. Alafabco, Inc*., 539 U.S. 52, 56 (2003) (interpreting the term "involving commerce" in the FAA "as the functional equivalent of the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power") (citations omitted); *Allied–Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 277-81 (1995) ("[I]f a contract involves interstate commerce, a court must resolve arbitration disputes according to the FAA."). Consequently, the FAA and its mandate governs interpretation of the Funding Agreement's arbitration provision.

Also, no generally applicable state law defenses prevent enforcement of the arbitration provision. Arbitration agreements, "as a matter of substantive federal arbitration law," are severable from the contracts that contain them. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006). As a result, "the issue of the contract's validity is considered by the arbitrator in the first instance." *Id*. Tuckman's contentions that the Funding Agreement was supposedly "false and fraudulent" do not render the arbitration provision unenforceable—rather, allegations against the Funding Agreement's validity are for the arbitrator to decide. *See id*.; *AT&T Techs., Inc. v. Commc'ns Workers of Am*., 475 U.S. 643, 649 (1986) (holding that a court may not consider "the potential merits of the underlying claims" in deciding an arbitration motion).

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

**B. The arbitration provision delegates arbitrability determinations to the arbitrator and, therefore, this Court need not conduct any further analysis.**

Under the FAA, parties may "agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes." *Schein*, 139 S. Ct. at 527. These threshold arbitrability questions include "whether the parties have agreed to arbitrate" in the first place, and "whether their agreement covers a particular controversy." *See id*. at 529; *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002). Delegation clauses must be supported by "clear and unmistakable" evidence. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). But if "a valid arbitration agreement exists," as it does in this case, and if the agreement clearly and unmistakably "delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Schein*, 139 S. Ct. at 530. Indeed, courts are required under § 2 to enforce delegation clauses even if they find the arbitrability argument to be "wholly groundless" or the answer obvious. *Id.* at 529; *Rent-A-Center*, 561 U.S. at 69-70 (holding "[a]n agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other").

Here, Tuckman agreed to arbitrate "[a]ny dispute, claim, or controversy arising out of or relating to this Agreement … including the determination of the scope or applicability of this Agreement to arbitrate…." *See* Funding Agreement, ¶ 14(B). That is a clear and unmistakable delegation provision. *See Chiron Corp. v. Ortho Diagnostic Sys., Inc*., 207 F.3d 1126, 1131 (9th Cir. 2000) (enforcing delegation provision that required "[a]ny dispute, controversy or claim arising out of or relating to the validity, construction, enforceability or performance of this Agreement shall be settled by binding Alternate Dispute Resolution ('ADR') in the manner

Homeʀ Bonneʀ Jacobʀ Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

described below"). The Funding Agreement also explicitly provides that "the arbitration shall be administered by JAMS pursuant to its JAMS' Comprehensive Arbitration Rules and Procedures." Ex. B, ¶ 14(B). JAMS Rule 11, "Interpretation of Rules and Jurisdictional Challenges," states that:

> (b) Jurisdictional and arbitrability disputes, including <u>disputes over</u> the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and <u>who are proper Parties to the Arbitration</u>, shall be submitted to and ruled on by the Arbitrator. The Arbitrator <u>has the authority to determine</u> jurisdiction and <u>arbitrability issues</u> as a preliminary matter.

JAMS Comprehensive Arbitration Rule 11(b), *available at* https://www.jamsadr.com/rules-comprehensive-arbitration/ (last visited Jan. 17, 2020) (emphasis added). This rule is broad and necessarily requires delegation to an arbitrator of initial questions regarding both the scope of the Funding Agreement and the proper parties to it.

In the Eleventh Circuit, agreements that incorporate AAA or similar arbitral forum rules such as JAMS qualify as clear and unmistakable evidence that the parties agreed to delegate questions of arbitrability to the arbitrator. *See, e.g., Terminix Intern. Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332-33 (11th Cir. 2005) (holding that, by incorporating the AAA Commercial Arbitration Rules into the arbitration agreement, the parties had clearly and unmistakably agreed than an arbitrator must decide whether the arbitration clause is valid); *Shea v. BBVA Compass Bancshares, Inc.*, No. 12-23324-CIV-MOORE, 2013 WL 869526 at *4 (S.D. Fla. Mar. 7, 2013) (finding that, by incorporating the rules of the AAA and JAMS into the arbitration provision, the parties clearly and unmistakably agreed than an arbitrator must, among other things, determine the arbitrability of plaintiff's claim under the Telephone Consumer Protection Act); *Senior Servs. of Palm Beach LLC v. ABCSP Inc.*, No. 12-80226-CIV-COHN, 2012 WL 2054971 at *3 (S.D. Fla. June 7, 2012) (collecting cases).

11

These delegation clauses are enforceable. To the extent Tuckman attempts to challenge the arbitrability of the dispute, whether his claims fall within the scope of the arbitration provisions or whether he may be compelled to arbitration, the arbitrator, not the Court, must resolve these issues. *See Rent-A-Center*, 561 U.S. at 69. This alone is grounds to grant this motion.

**C.  Tuckman's claims are arbitrable in any case.**

The Court applies the federal substantive law of the FAA to determine whether the parties agreed to arbitrate this dispute. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc*., 473 U.S. 614, 626 (1985) (holding "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute … applying the federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act") (internal quotations and citation omitted). Putting the delegation agreements aside, Tuckman's disputes are arbitrable no matter who decides the question. Tuckman is equitably estopped from refusing to arbitrate his claims against Chase, and Chase is entitled to enforce the arbitration provision against Tuckman. Further, Tuckman's claims fall squarely within the scope of the arbitration provision.

**1.  Tuckman's claims fall within the scope of the arbitration provision.**

The arbitration provision in the Funding Agreement broadly covers "[a]ny dispute, claim or controversy arising out of or relating to [the] Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate." Funding Agreement, ¶ 14(B). Any doubts about scope must be resolved in favor of arbitration. *See Moses H. Cone*, 460 U.S. at 24-25. As long as

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

Tuckman's allegations "touch matters covered by the enumerated articles [of arbitration]," a court should "properly resolve[] any doubts in favor of arbitrability." *See Mitsubishi*, 473 U.S. at 625.

In this case Tuckman's claims all fall within the scope of the broad arbitration provisions. Tuckman alleges that before he "wired the $1.85 million into the purportedly 'secure' Chase Account, he requested confirmation from JPMorgan that the account was in fact secure." Cmplt. ¶ 114. Tuckman alleges he specifically relied on representations from Chase about Chase "open[ing] a secured account 'managed in accordance' with the Depositor Funding Agreement, that McConley's business entity [Forrest Capital] had accounts in 'good standing' with [Chase], and that those accounts in good standing had over $3.7 million in funds without restrictions or holds…." Cmplt. ¶ 115. The Complaint then alleges, as its core allegations, that the representations were false and that the Funding Agreement itself was supposedly "false and fraudulent … and specifically designed to further the criminal scheme and to steal Brad Tuckman's money … [and] conceal the criminal scheme for as long as possible…." Cmplt. ¶ 122. Tuckman claims his supposed injury arose when "Van Eman and McConley stole Tuckman's money as soon as they received it in the Chase Account" and "never matched Tuckman's contribution." Cmplt. ¶ 124. As these allegations illustrate, the entire theory of Tuckman's case is that the Funding Agreement contained a fraudulent and *invalid* deal, and that Weathervane and Forrest Capital stole BFF's money out of the Chase account and never matched his contribution.

In short, Tuckman's own allegations depend on his decision to have his special-purpose company, BFF, enter the Funding Agreement, and on the contention that the Funding Agreement was then breached. It does not matter what particular claims he attempts to bring. The Complaint makes clear that they all arise out of the Funding Agreement. His RICO claims are therefore just

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

as arbitrable as his common law claims under the FAA. *See PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 407 (2003) (holding "the proper course is to compel arbitration" of RICO claims despite remedial limitations in the arbitration agreement). Because his allegations "aris[e] out of or relat[e] to [the] Agreement" including its "breach, termination, enforcement, interpretation [and] validity…," Tuckman's claims fall squarely within the scope of the arbitration agreement.

### 2. Chase can enforce the arbitration provisions against Tuckman.

Despite his publicly filed action in the name of BFF against the alleged scammers under the Funding Agreement, Tuckman is attempting to bring derivative claims against Chase in his own name. But mere artful pleading does not render the Funding Agreement inapplicable or relieve him of the arbitration provision. The Supreme Court has held that a non-signatory may compel arbitration where "the relevant state contract law allows him to enforce the agreement." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009). Generally, applicable state contract law governs "the scope of agreements (including the question of who is bound by them)." *Id.* at 630. The U.S. Supreme Court has recognized that generally applicable "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Id.* at 631 (citing 21 R. Lord, Williston on Contracts § 57:19, p. 183 (4th ed. 2001)). Florida law recognizes these same principles. *See, e.g.*, *Allied Prof'ls Ins. Co. v. Fitzpatrick*, 169 So. 3d 138, 142 (Fla. 4th DCA 2015) (identifying the circumstances when "a non-signatory may be bound to arbitrate"); *Koechli v. BIP Intern., Inc.*, 870 So. 2d 940, 944 (Fla. 1st DCA 2004) (recognizing the grounds on which "Florida and federal courts have recognized that a non-signatory can compel arbitration by a signatory to an arbitration agreement").

14

Here, the arbitration provision is clear on its face that any claim arising out of or related to the Funding Agreement must be arbitrated. Chase can enforce this arbitral provision against Tuckman on several theories.

### a. Tuckman is equitably estopped from denying Chase's right to enforce the arbitration agreement against him.

*First*, the doctrine of equitable estoppel dictates that Tuckman must submit his purported claims against Chase to arbitration. The purpose of equitable estoppel is to prevent parties like Tuckman from avoiding arbitration in cases exactly like this one. Tuckman seeks to recover his losses—and then some—from Chase, as though Tuckman never agreed to the contractual obligations in his underlying investment with Forrest Capital and Weathervane. In fact, Tuckman as one of the "signatories" did "specifically agree" to the terms of Section 8, which prohibited the very actions Tuckman contends injured him, including the theft of BFF's $1.85 million deposit. *See* Funding Agreement at 3, Ex. B hereto. The arbitration provision applies to Section 8 as it does to any other provision in the Funding Agreement. Chase seeks only to compel Tuckman to adhere to the contractual obligations to which he already agreed.

Equitable estoppel "precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *See Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308, 1311-12 (11th Cir. 2005) (citation omitted). Courts have applied equitable estoppel where the purported claims derive from or are necessarily related to the contract, and where the claims are intertwined with the contract. *See Escobal v. Celebration Cruise Operator, Inc.*, 482 Fed. Appx. 475, 476 (11th Cir. 2012) (finding non-signatory required to arbitrate on equitable estoppel grounds where "claim against Cruise Line is inextricably intertwined with his claims against the contract signatory"); *Blinco*, 400 F.3d at 1311-12 (holding

15

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

the alleged statutory claims "derive from [the plaintiff's] status as a borrower under the Note" and therefore "Blinco may not rely upon the Note to establish her RESPA claims while avoiding her obligation under the Note to arbitrate such claims."); *Fitzpatrick*, 169 So. 3d at 142 (holding "plaintiffs cannot claim they are entitled to the benefit of the policy's coverage provision while simultaneously attempting to avoid the burden of the policy's arbitration provision"); *Koechli*, 870 So. 2d at 944-45 (holding that "even though BIP's claims sound in tort, BIP's claims rely upon and are necessarily related to the refurbishment agreement."); *Martha A. Gottfried, Inc. v. Paulette Koch Real Estate*, 778 So. 2d 1089, 1090 (Fla. 4th DCA 2001) (holding "Gottfried, while not a signatory … is, nevertheless, bound by her agreement to arbitrate, as having accepted the economic and professional benefits of Hoffpauer's membership with the board").

Tuckman may couch his case in sensationalist claims of RICO and fraud, but in substance he is attempting to recover for himself alleged injuries from the breach of the Funding Agreement, after having already sued in BFF's name in Broward Circuit Court. The instant Complaint makes repeated references to the Funding Agreement, and the central contention is that the investment deal offered under the Funding Agreement was supposedly fraudulent. As described above, his claims center around the breach of the Funding Agreement. He alleges a supposed "conspiracy" or "scheme" in which Chase supposedly participated to enable Weathervane and Forrest Capital to convert BFF's wired funds from the Chase account. In the most obvious way, Tuckman's alleged personal claims derive from and are inextricably intertwined with the Funding Agreement. As a result, he is estopped from avoiding enforcement of the arbitration provision.

*Second*, Tuckman's purported claims are explicitly founded on and intimately connected with the actions of the alleged signatories, Weathervane and Forrest Capital, who Tuckman claims

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

breached the contract and defrauded him. Equitable estoppel applies in this instance where a plaintiff alleges "substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract." *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999), abrogated on other grounds by *Carlisle*, 556 U.S. at 631; *Koechli*, 870 So. 2d at 944 (same). Since Tuckman's purported claims of RICO, civil conspiracy, and aiding and abetting conversion and fraud depend on Chase having supposedly been a part of a scheme and acting in concert with Weathervane's and Forrest Capital's principals, *see* Cmplt. at 19-23, Tuckman cannot avoid the arbitration provision.

### b.  Tuckman is bound by the arbitration provision as BFF is his alter ego.

*Third*, Tuckman is bound to the arbitration provision under alter ego/veil piercing principles. Generally applicable Florida law will pierce the corporate veil when the corporation is a "mere instrumentality" or alter ego of the defendant, and that the defendant engaged in "improper conduct" in the formation or use of the corporation. *See Bellairs v. Mohrmann*, 716 So. 2d 320, 323 (Fla. 2d DCA 1998). This doctrine recognizes that "[t]hose who utilize the laws of this state in order to do business in the corporate form have every right to rely on the rules of law which protect them against personal liability *unless it be shown that the corporation is* formed or *used* for some illegal, fraudulent or other unjust purpose which justifies piercing of the corporate veil." *Id*. at 323 (emphasis in original). Piercing the corporate veil is therefore proper when the corporation "is a mere device or sham to accomplish some ulterior purpose, … or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose." *See Eckhardt v. U.S.*, 463 Fed. Appx. 852, 855 (11th Cir. 2012) (citation omitted). Tuckman, the sole principal of BFF, has used the corporate form as a mere instrumentality for improper purposes—first to secure

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

a judgment for BFF for injuries he now alleges he personally suffered from Weathervane's and Forrest Capital's defaults under the Funding Agreement, and then to shed the corporate form in an attempt to sue Chase for exactly the same injuries in his individual capacity. The alter ego and veil piercing doctrine exists to prevent such abuse of the corporate form for convenience and profit.

### c.   Tuckman is judicially estopped from denying his obligation to arbitrate.

*Fourth*, judicial estoppel bars Tuckman from denying that BFF is his alter ego. After obtaining millions of dollars in judgments in the name of BFF, Tuckman now wants to forget BFF in this proceeding and sue for the same alleged injuries in his own name. Judicial estoppel prevents such a change in position to maximize profits. *See Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017) (explaining the purpose of judicial estoppel to "prevent the perversion of the judicial process and protect [its] integrity ... by prohibiting parties from deliberately changing positions according to the exigencies of the moment'") (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001)); *see also* Sec. D *infra*. Tuckman himself wants to ignore BFF's corporate form, for otherwise he has no case. BFF is undeniably the real party in interest under the Funding Agreement, which names BFF as the party to pay out certain money. But if Tuckman is going to assume individually BFF's right to sue for injuries, he must assume also BFF's duties under the arbitration provision as well. *See id.*

### d.   The Complaint's allegations confer third-party beneficiary status on Chase, and therefore Chase can enforce the arbitration provision in the Funding Agreement.

*Fifth*, Chase can enforce the arbitration provision because the Complaint's allegations confer intended third-party beneficiary status on Chase. A party qualifies as an intended beneficiary where "the contract itself expresses, an intent to primarily and directly benefit the third

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

party…." *Dingle v. Dellinger*, 134 So. 3d 484, 488 (Fla. 5th DCA 2014). Courts "look to nature or terms of contract to find parties' clear or manifest intent that it is for third party's benefit." *See id.* (citation omitted). Also, "it is not necessary that the third-party beneficiary is named in the contract," as "the parties' pre- or post-contract actions may establish their intent." *Id.* In this case, Chase is clearly and expressly identified in the Funding Agreement, along with the specific Chase account into which BFF deposited money. *See* Funding Agreement ¶¶ 8(B), 10. While Chase was neither a party nor a signatory to the Funding Agreement, Tuckman's allegations (if the allegations are taken as true solely for this motion)—that Chase supposedly "earned transaction fees" and received "other monetary and non-monetary benefits" from the funding—would confer third-party beneficiary status on Chase. Cmplt. ¶ 31. Chase therefore can also enforce the Funding Agreement's arbitration provision. *See Carlisle*, 556 U.S. at 630.

**D. Alternatively, judicial estoppel bars Tuckman's case entirely.**

This Court may dismiss this action in lieu of compelling it to arbitration based on Tuckman's perversion of the legal system by obtaining judgments in the name of BFF of about $3.8 million in the Broward Circuit Court action, and then bringing suit here as himself. That is the very "perversion of the judicial process" judicial estoppel is meant to prohibit. *See Slater*, 871 F.3d at 1180. The doctrine "rests on the principle that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." *Id.* 1180-81 (internal quotations omitted). The Eleventh Circuit applies judicial estoppel when a "party took an inconsistent position under oath in a separate proceeding," and "these inconsistent positions were calculated to make a mockery of the judicial system." *Id.* at 1181 (internal quotations omitted). The statements do not necessarily

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

have to be made under oath as the more important inquiry "is whether they are intended to mislead and deceive the court." *Smith v. Haynes & Haynes P.C.*, 940 F.3d 635, 643 n.4 (11th Cir. 2019) (internal quotations and citations omitted).

Tuckman already succeeded in obtaining judgments worth about $3.8 million in BFF's name against Weathervane and Forrest Capital for supposed damages from his deposit under the Funding Agreement. That he would turn around in federal court and claim exactly the same damages in his *individual* capacity on derivative claims,[4] omitting any reference to BFF, Weathervane, or Forrest Capital, demonstrates his flagrant and thinly veiled attempt to confuse and misuse judicial proceedings. This case represents an utterly contrary position on who the alleged damaged party is, as Tuckman pursues a double recovery. Accordingly, this Court may dismiss this action outright.

Otherwise the Court should stay this action pursuant to § 3 of the FAA. A stay under § 3 is mandatory once a district court is "satisfied that the issue involved in such suit or proceeding is referable to arbitration." 9 U.S.C. § 3. *See Klay v. All Defendants*, 389 F.3d 1191, 1203-04 (11th Cir. 2004) (holding "[f]or arbitrable issues, the language of Section 3 indicates that the stay is mandatory"). If this Court does not dismiss this action, it should stay it.

## IV.   CONCLUSION

For all the foregoing reasons, Chase requests that this Court order Plaintiff to arbitrate his claims and stay these proceedings pending arbitration, or dismiss Plaintiff's claims entirely.

---

[4] Aiding and abetting fraud claims are textbook secondary liability theories based on the existence of an underlying fraud. *See ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Maryland*, 917 So. 2d 368, 372 (Fla. 5th DCA 2005) (discussing the elements of aiding and abetting fraud claims).

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

## <u>REQUEST FOR HEARING</u>

Pursuant to Local Rule 7.1(b)(2), Chase hereby requests that the Court conduct oral argument on this Motion. Chase believes oral argument will materially assist the Court in resolving the Motion, and estimates thirty to forty-five (30-45) minutes for combined argument will suffice.

Date: January 17, 2020.

Respectfully submitted:



1200 Four Seasons Tower
1441 Brickell Avenue
Miami Florida 33131
Phone: (305) 350-5139
Fax: (305) 372-2738

By:   */s/Peter W. Homer*
        Peter W. Homer, Esq.
        Email: phomer@homerbonner.com
        Florida Bar No.: 291250

*Attorneys for JPMorgan Chase Bank, N.A.*

21

## CERTIFICATION OF SERVICE

I hereby certify that, on January 17, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will also send notice of this electronic filing to the following counsel of record:

Adam M. Schachter
Florida Bar No. 647101
aschachter@gsgpa.com
Freddy Funes
Florida Bar No. 87932
ffunes@gsgpa.com
Brian W. Toth
Florida Bar No. 57708
btoth@gsgpa.com
Christian G. Montelione
Florida Bar No. 122511
cmontelione@gsgpa.com
GELBER SCHACHTER & GREENBERG, P.A.
1221 Brickell Avenue, Suite 2010
Miami, Florida 33131
Phone: (305) 728-0950
E-service: efilings@gsgpa.com

*Counsel for Plaintiff Brad Tuckman*

Sara F. Holladay-Tobias
stobias@mcguirewoods.com
Emily Y. Rottmann
erottmann@mcguirewoods.com
Brittney L. Difato
bdifato@mcguirewoods.com
McGUIREWOODS LLP
50 N. Laura Street, Suite 3300
Jacksonville, Florida 32202
Phone: (904) 798-3200
flservice@mcguirewoods.com

*Counsel for Wells Fargo Bank, N.A.*

Jonathan S. Klein
jklein@mayerbrown.com
MAYER BROWN LLP
1999 K. Street NW
Washington, DC 20006
Phone: (202) 263-3327
wdc.docket@mayerbrown.com

and

Glenn K. Vanzura (*pro hac vice*)
GVanzura@mayerbrown.com
Jason D. Linder (*pro hac vice*)
JLinder@mayerbrown.com
MAYER BROWN LLP
350 S. Grand Avenue, 25th Floor
Los Angeles, CA 90071
Phone: (213) 229-9500

*Counsel for John Torres*

*/s/Peter W. Homer*
PETER W. HOMER

22

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com